<table>
<tr><td>

**DISTRICT COURT, CITY AND COUNTY OF BOULDER, COLORADO**

**Court Address:**
**1777 6ᵗʰ Street**
**Boulder, CO 80301**

</td><td>

DATE FILED: October 31, 2019 3:01 PM
FILING ID: 1A426ECF47857
CASE NUMBER: 2019CV31069

</td></tr>
</table>

| | |
|---|---|
| **Plaintiff,**<br><br>**David W. Doyle,**<br><br>**v.**<br><br>**Defendants,**<br><br>**Unum Group a.k.a. Unum Life Insurance Company, The Paul Revere Life Insurance Company a.k.a. Paul Revere Group; and their parent companies and subsidiary companies.** | **▲ COURT USE ONLY ▲**<br><br>Case No.<br><br>Div. |
| Attorneys for Plaintiffs:<br>John G. Taussig, III, #13496<br>Scott D. Smith #<br>TAUSSIG & SMITH, P.C.<br>5377 Manhattan Circle, Suite 203<br>Boulder, CO 80301<br>Phone No.: 303-443-2700<br>Fax No.: 303-448-9600<br>jt@taussigsmith.com<br>scott@taussigsmith.com | |

**COMPLAINT AND JURY DEMAND**

**PARTIES, JURISDICTION AND VENUE**

1. David W. Doyle is a resident of Colorado, residing at 80 Topaz Street, Golden, CO 80401.

2. Defendant Unum Group is a general business corporation organized under the laws of Delaware. Its headquarters, main administrative office and home office, principal place of business, and the primary location for its corporate books and records, are all at 1 Fountain Square, Chattanooga, Tennessee. Unum Group also has corporate offices at 2211

EXHIBIT A

Congress Street, Portland, Maine, 1 Mercantile Street, Worcester, Massachusetts, and 1200
Colonial Life Blvd., Columbia, South Carolina. Unum Group is licensed to do business in
Colorado and is doing business within the state of Colorado. Unum Group acts as an
insurance holding company under the insurance holding company acts of the various states,
including Colorado. Under the same holding company statutes Unum Group is the also
ultimate controlling person of The Paul Revere Life Insurance Company ("Paul Revere").
Prior to changing its name to Unum Group in 2007, Unum Group was known as
UnumProvident Corporation. Before June 30, 1999 and its merger with Unum me
UnumProvident Corporation, was known as Provident Companies, Inc. In 1997, Provident
Companies, Inc. acquired Paul Revere.

3. Unum Group's insurance company subsidiaries sell a variety of insurance products, such as
disability insurance, long-term care insurance, life insurance, employer and employee paid
group benefits and related services. Although insurance policies are issued by Unum Group's
insurance company subsidiaries, these subsidiaries have no employees. Employees of Unum
Group provide services to Unum Group's subsidiaries, including Paul Revere, pursuant to a
General Services Agreement. In that regard, Unum Group's production activities consist of
services provided by its employees to its insuring subsidiaries relating to facilities
management, provision of legal services, internal audit, cash management, financial
management, actuarial services, product pricing, corporate relations, marketing and product
support, sales management, product design, underwriting, systems management and claims
management. The majority of Unum Group's production activities occur in Tennessee,
Massachusetts, Maine and South Carolina.

4. The Paul Revere Life Insurance Company is a corporation organized and existing under the
laws of Massachusetts. Paul Revere no longer has any employees and no longer actively
markets insurance policies under its own name. Individual own occupation disability
insurance policies once issued by Paul Revere, such as that issued to Plaintiff in this matter,
are part of what Unum Group has designated as the "closed block." While incorporated in
Massachusetts, Paul Revere's home office is now 2211 Congress Street, Portland, Maine, the
same address as one of the corporate offices of Unum Group. With respect to administering
policies previously issued by Paul Revere and claims for benefits made on such policies, the
majority of the above-mentioned production activities occur in Worcester, Massachusetts,
Chattanooga, Tennessee, Portland, Main and Columbia, South Carolina.

5. As insurers and entities engaged in the business of insurance, licensed to do business within
Colorado, defendants Unum Group and Paul Revere, their officers, directors, employees and
agents are charged with knowledge of the laws of Colorado, more particularly those laws
pertaining to the business of insurance including statutory, regulatory and common law
obligations.

6. The relationship between defendants Paul Revere and Unum Group is such as to make them
joint ventures, a single enterprise, and/or alter egos of one another regarding the
administration of claims for which Paul Revere is nominally responsible. The insurance

2

claim of plaintiff Doyle, made on a policy issued by Paul Revere, was actually administered by employees and/or agents of defendant Unum Group.

7. This Court has subject matter jurisdiction and jurisdiction over the parties.

8. Venue is proper in this court for these claims between these parties.

## FACTS

9. At all times material or relevant hereto, Plaintiff David Doyle's occupation was that of a trial lawyer.

10. On May 22, 1996 Mr. Doyle applied for a Paul Revere Preferred Professional Disability Income Insurance Policy with The Paul Revere Life Insurance Company, also known as Paul Revere Insurance Group ("Paul Revere.")

11. On or about July 26, 1996 Paul Revere issued a Disability Income policy in response to Mr. Doyle's application.

12. The policy issued by Paul Revere was issued in exchange for Mr. Doyle's payment of premiums and Mr. Doyle was continuously insured under the policy, since it was issued.

13. The Disability Income policy had a policy number: 01028060960, and will be referred to as "the policy" throughout, at times.

14. The policy provided Disability Income insurance benefits ("IDI") which paid Mr. Doyle $7,000/month if he was unable to perform his occupation as a trial lawyer, due to injury or sickness.

15. The policy included additional benefits for an additional premium.

16. Mr. Doyle has never breached any part of the policy.

17. Mr. Doyle has never violated any of the requirements of the policy.

18. Mr. Doyle became disabled as defined by the IDI policy, making Paul Revere liable for benefits.

19. Paul Revere, and the other defendants, unreasonably denied the benefits causing Mr. Doyle damages, including attorney's fees and other damages.

20. Eventually Paul Revere agreed to pay the IDI benefits and did so for a number of years.

3

21. The Paul Revere policy required Defendants to pay $XXX for Mr. Doyle's lifetime, if injury or sickness caused him to totally and irrecoverably lose use of both feet (loss of use of both feet); and the loss occurred prior to age 65.

22. The lifetime benefits are called Presumptive Total Disability (PTD) benefits.

23. Total and irrecoverable loss of use of both feet means, loss of use of both feet that causes the insured to be unable to perform his own occupation, i.e that of a trial lawyer.

24. Mr. Doyle made a claim for PTD benefits, due to total and irrecoverable loss of use of both feet, long before he was aged 65.

25. Mr. Doyle's 65th birthday was March 3, 2018.

26. Mr. Doyle has had total and irrecoverable loss of use of both feet for at least 7 years.

27. Defendants knew that Mr. Doyle's IDI claim was based on PTD due to loss of use of both feet at least 7 years before Mr. Doyle's 65th birthday.

28. The only proof of loss Defendants have required under the IDI policy, for more than 10 years is a note, written by a doctor, on a prescription pad or any other piece of paper saying, "please continue disability" or "please continue disability due to loss of use of both feet," or something substantially similar.

29. Such a note would be provided by Mr. Doyle every three months or so, and such proof of loss satisfied all requirements of the policy and Defendants.

30. In April 2014 Defendants acknowledged that Mr. Doyle's claim was based on PTD benefits as a result of the total and irrecoverable loss of use of both feet.

31. On April 21, 2014 Defendants acknowledged the PTD claim referred to above, but stated they "disagree and contend that, given Doyle's current medical condition he is not entitled to such benefits."

32. Defendants stated no reason for their disagreement or contention at any time for many years and at no time between April 21, 2014 and March 3, 2018 when Defendants denied further PTD benefits, without a reason.

33. On April 21, 2014 Defendants waived any and all possible defenses to Mr. Doyle's claim for PTD benefits by knowingly signing an agreement saying so.

34. The policy has a section 6.2, called "concurrent disability" where Defendants promise that if there is more than one Disability benefit for the same period (for example, one

4

from sickness and a PTD) Defendants will not pay more than one benefit, but "will always pay the largest benefit."

35. The "largest benefit" is PTD, because it pays for lifetime, whereas other disabilities, such as sickness only pay to age 65.

36. Therefore, if Mr. Doyle had a PTD and a disability benefit that would end at age 65, Defendants agreed, in the policy, they would pay the PTD benefit.

37. In the policy, Defendants promise that after they receive written notice of a claim, they will either send proof of loss forms within 15 days, or they will accept what the insured provides them as proof of loss.

38. Defendants never requested or required Mr. Doyle provide any specific proof of loss forms, thus Defendants have waived the requirement that Mr. Doyle provide proof of loss.

39. Defendants waived all defenses and all requirements for any proof of loss, no later than April 21, 2014.

40. Defendants stopped paying IDI benefits on March 3, 2018 without conducting any investigation and without considering it had waived all requirements, and the right to investigate further or ask for proof of loss.

41. By not contesting or requesting further proof of loss of Mr. Doyle's claim for PTD benefits, prior to April 21, 2014, Defendants also waived and/or are estopped from denying benefits for Mr. Doyle's lifetime.

42. After making the claims decision to deny benefits, and stopping Mr. Doyle's IDI benefits, Defendants conducted a sham investigation and then claimed it was relying on that to support its denial of further benefits.

43. Defendants' post-denial investigation was a sham in that it violated promises Defendants made and orders against it by insurance commissioners across the country, including:

   a. Ignoring the credible evidence in favor of its own, manufactured, self-serving biased medical opinions that were fraudulent;
   b. Misrepresenting and speculating about facts rather than rely on proof otherwise;
   c. Rejecting a claimant's treating doctor's opinion even though the opinion was well supported by medically acceptable clinical or diagnostic standards, and was consistent with other substantial evidence in the record;
   d. Failing to secure an IME when there is a disagreement between Defendants and the treating doctor;

   e. Requiring redundant or unnecessary requests for information not reasonably required for adequate analysis of the claim;

   f. Continuing to seek additional information where claimants have provided adequate proof of disability;

   g. Failing to consider all diagnoses and impairments and their effect on the whole person;

   h. Interpreting or applying information from the treating doctor in an unfair manner;

   i. Unfairly interpreting surveillance tapes:

   j. Failing to document claim files adequately regarding roundtable sessions at which substantives claims decisions are made;

   k. Characterizing certain disabling conditions as self-reported, e.g., pain and weakness, and requiring objective evidence to support disability, even though not required by the policy; and

   l. Mischaracterizing the claimant's occupation and/or his duties in determining whether the claimant is disabled under the policy, and specifically presumptively totally disabled.

44. Defendants' denial letter, dated March 1, 2019 reflects an adversarial approach to claims handling inappropriate in the first party insurance context of individual, own-occupation, disability insurance claims' handling, including:

   a. Falsely claiming that Plaintiff could effectively use his feet;

   b. Relying on the inaccurate and biased evaluations of in-house medial reviewers who had not spoken with, examined, or treated Plaintiff over the opinions of treating physicians who had multiple opportunities to examine, treat, and evaluate the Plaintiff;

   c. Relying on surveillance footage and the inaccurate characterization of the same, which failed to depict Plaintiff engaged in any act inconsistent with his claim of disability;

   d. Disputing without a reasonable basis grounded in fact, Plaintiff's disability;

   f. Disregarding the treatment records of attending physicians on the basis of statements from in-house reviewers that such treatment was "patient driven" and "therapeutic, not diagnostic" when Defendants' policies contain no exclusion which would permit such distinctions and ignored the clinical judgment of the treating physician that such treatments were reasonably necessary and appropriate;

   g. Ignoring evidence that supported the claim;

   h. Misrepresenting the terms of Mr. Doyle's policy.

45. It is unreasonable, as a matter of law, to deny benefits before conducting a reasonable investigation based upon all available information.

6

46. Defendants denied benefits without conducting a reasonable investigation based upon all available information.

47. Defendants denied benefits despite knowing they had waived and are estopped from doing so.

48. For years, Defendants knowingly categorized benefits internally as based on sickness, when it knew Mr. Doyle was claiming PTD due to the loss of use of both feet, such that it would support stopping them at Mr. Doyle's 65th birthday, without ever telling him. That is intentional misrepresentation.

49. Defendants' conduct in this case was done purposefully to delay letting their insured know their intentions (to cut him off at age 65) long enough so that his ability to contest or fight their decision would be compromised by the passage of time, failing health, failing memory, loss of documents or evidence, and more.

50. Defendants knew their conduct as described above was unreasonable, and in fact was reprehensible based on prior lawsuits with similar facts, as found by courts, including, but not limited to *August v. Provident Life and Accident Insurance Co., et al,* 772 F. Supp. 1197 (U.S. Dist. Ct. 2011).

51. Defendants conduct, in this case, was intentional, willful and wanton, reckless, such that Plaintiff should be awarded exemplary damages.

52. Defendants knew their conduct was unreasonable, willful and wanton because they were repeating conduct they had been criticized for by 49 states' insurance commissioners; in numerous lawsuits were courts found their conduct (identical to what they did to Mr. Doyle) to be reprehensible; and because their own claim file documented they were causing Mr. Doyle further medical difficulties including psychiatric problems and physical problems.

53. Defendants conduct is a business practice, and has been for many years. Defendants knowingly have engaged in conduct identical to the conduct in this case in many claims across the country, so frequently that it is the Defendants' business practice, in violation of industry standards and Colorado law: CRS 10-3-1104(1)(h).

54. Defendants have not paid benefits to Plaintiff since March 3, 2018.

55. All of the activities of Defendants' employees were taken in the course and scope of employment of Defendants.

56. The conduct of Defendants' claims personnel is a result of a corporate culture established by Defendants that pressures and incentivizes claim personnel to meet targets and goals

for claim closures. Defendants also set targets and goals with respect to reopening claims. Just as Defendants will go to extraordinary lengths to come up with justifications for closing claims initially, they will go to similar lengths to avoid reopening them, just as they did with Mr. Doyle's claims as alleged herein.

57. Such targets and goals, and progress towards meeting them, are communicated to claims personnel in a variety of ways.

58. Under Unum Group's incentive compensation plan, the benefits department, medical and vocational consultants, and individual claims handlers are improperly incentivized to achieve corporate financial expectations. Financial expectations for the benefits department are set at the corporate level. Compensation of claims staff, including medical consultants, is directly tied to each individual's contribution to achieving those expectations. Claim personnel strive to attain the highest rating possible to maximize their incentive compensation. Achieving high ratings can substantially increase an employee's yearly income. For individuals such as Unum Group OSPs and DMOs, annual performance based incentive compensation can be 20% or more of their earnings. Unum Group's high level corporate officers also participate in the incentive compensation program. Achieving corporate financial goals, including goals contributed to by the claims organization has resulted in millions of dollars of additional compensation to high level corporate officers. The purpose and effect of the incentive compensation plan throughout the claims organization is to motivate employees, managers, officers and directors to put the financial interests of the Defendants above that of their policyholders and to motivate and reward said individuals for finding means to deny and terminate the legitimate claims of policyholders.

59. Unum's incentive compensation plan aligns Unum's employees with its annual business plans.

60. Unum's business plans for each year included setting expectations for Liability Acceptance Rates and tracking the progress made towards meeting those expectations throughout the year.

61. Unum's business plans for each year including setting expectations for the A/E recovery rate, a measure of claim closures, and tracking the progress made towards meeting those expectations throughout the year.

62. Unum's business plans for each year includes setting expectations for the A/E recovery rate and tracking the progress made towards meeting those expectations throughout the year.

63. Unum's business plans for each year included setting expectations for Reopen Rates and tracking the progress towards meeting those expectations throughout the year.

8

64. Unum's business plan for each year includes setting expectations for Reopen Rates and tracking the progress towards meeting those expectations throughout the year.

65. Unum tied the achievement of corporate financial goals each year to the claims department employees' compensation through the corporate performance based incentive compensation plan.

66. Unum has tied the achievement of corporate financial goals for each year to the claims department employee's compensation through the corporate performance based incentive compensation plan.

67. Unum communicated to tis claims department employees in each year that unless corporate financial goals were met, no incentive compensation would be paid.

68. Unum has communicated to its claims department employees each year that unless corporate financial goals are met, no incentive compensation will be paid.

69. The actions of each of Unum's employees involved in the handling of Mr. Doyle's claim was undertaken with knowledge that unless corporate financial results were met no incentive compensation would be paid to them.

70. The conduct of each of the Defendants as alleged herein was taken with the intent to cause injury, was motivated by spite or ill will, or was undertaken by the Defendant who were acting to serve their own interests, while having a reason to know and consciously disregarding a substantial risk that that the conduct engaged in might significantly injure the rights of others, including Mr. Doyle.

## FIRST CLAIM FOR RELIEF
## (BREACH OF AN INSURANCE CONTRACT)

71.    Plaintiff incorporates all previous allegations as if more fully set forth herein.

72.    Pursuant to the terms of the policy, Defendants contracted to provide insurance coverage, including IDI benefits for PTD to Plaintiff.

73.    The policy provided by Defendants to Plaintiff made Defendants responsible for, and liable to timely pay IDI benefits for PTD to Plaintiff.

74.    Defendants breached the contract by unreasonably denying and delaying benefits.

75.    Due to the breach of contract, Plaintiff suffered damages and losses. Pursuant to the terms of the Policy, Defendants were obligated to immediately pay policy benefits so that those damages and losses would not be exacerbated.

76.     Defendants have failed and refused to pay for reasonable and necessary mitigation and
        remediation of the loss arising from the incident.

77.     Defendants have failed and refused to perform their other obligations owed to Plaintiff
        under the terms of the policy and under Colorado law.

78.     The insurance coverage provided by Defendants is of such a personal and special nature
        that Defendants knew or should have known that a breach of the insurance contract
        would result in mental and emotional distress and suffering. Additionally, Defendants'
        breach of the insurance contract caused damages due to the willful and wanton or
        insulting conduct accompanying the breach of the insurance contract.

79.     Plaintiff has complied with all conditions precedent to coverage under the insurance
        policy issued by Defendants for which Plaintiff is an insured.

80.     To the extent that Plaintiff has failed to comply with any of the contractual obligations,
        Defendants have not been prejudiced by the failure to comply or have waived any non-
        compliance.

81.     As a direct and proximate result of Defendants' breach of contract, Plaintiff has suffered
        damages and losses in the amount to be proved at the time of trial. These damages and
        losses were foreseeable at the time of contracting and were the natural and probable
        consequence of Defendants' breach of the terms of the policy.

## SECOND CLAIM FOR RELIEF
### (BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
### INSURANCE CONTRACT)

82.     Plaintiffs incorporate all previous allegations as if more fully set forth herein.

83.     As a provider of insurance services to the public, Defendants at all times had a duty to
        be actuated by good faith and fair dealing in everything pertaining thereto, abstain from
        deceptive or misleading practices and keep, observe, and practice the principles of law
        and equity in all matters pertaining to the business of insurance.

84.     Under Colorado law, every insurance contract contains an implied covenant of good
        faith and fair dealing and imposes on insurers a duty to act in good faith with their
        insureds.

85.     Defendants have breached their duty of good faith and fair dealing owed to Plaintiff,
        including but not limited to violating each subsection of CRS 10-3-1104(1)(h) and (hh)
        willfully and frequently enough to indicate it is a general business practice.

86. Defendants' aforesaid conduct was unreasonable and Defendants either knew such conduct was unreasonable or recklessly disregarded the fact that the conduct was unreasonable.

87. As a direct and proximate result of Defendants' breach of their duty of good faith and fair dealing, Plaintiffs have sustained damages in an amount to be proven at trial.

88. Plaintiff's damages include economic losses, noneconomic losses, the covered benefit, plus two times the covered benefit, interest, loss of use of the money and attorneys' fees and costs.

## THIRD CLAIM FOR RELIEF
## (VIOLATION OF C.R.S. § 10-3-1115(1)(A) AND C.R.S. § 10-3-1116(1))

89. Plaintiff incorporates all previous allegations as if more fully set forth herein.

90. Defendants' delay and denial of Plaintiff's claim for individual, own-occupation, disability's insurance benefits is unreasonable.

91. Pursuant to C.R.S. § 10-3-1116(1), Plaintiff is entitled to reasonable attorney's fees, costs and two times the covered benefit.

## FOURTH CLAIM FOR RELIEF
## (COLORADO CONSUMER PROTECTION ACT VIOLATION)

92. Plaintiff incorporates all previous allegations as if more fully set forth herein.

93. Defendants' conduct is both reprehensible and inequitable, such that it acts as a repudiation or anticipatory breach, such that Plaintiff should be awarded future benefits.

94. Defendants' conduct is both reprehensible and inequitable, such that it is equitably estopped from asserting any defenses to Plaintiff's IDI claim, or the claims made in this complaint. This is in part because knowing what it had done and had been found to be reprehensible and inequitable in cases, such as *August*, it did the same thing to Plaintiff, i.e. Defendants induced him into believing they had accepted his claim for PTD benefits, he relied on their inducement and as a result is prejudiced.

95. Defendants have waived any defenses they have to Plaintiff's claim for benefits and the claims made in this complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff has suffered injuries, harms and losses as a result of the Defendants conduct; and respectfully asks that judgment enter against Defendants and in favor of Plaintiff in an amount to be determined at trial; including compensation for the following damages:

a.    Non-economic losses incurred to the present time, or which will probably be incurred in the future, including, but not limited to, pain and suffering, inconvenience, emotional stress, and impairment of the quality of life;

b.    Economic losses incurred to the present time, or which will probably be incurred in the future;

c.    Interest on damages pursuant to CRS 13-21-101, including pre-judgment interest, costs, expert witness fees and any other money Plaintiff is entitled to.

d.    Compensatory damages that Plaintiff is entitled to for Defendants' unreasonable conduct and bad faith, including economic losses, emotional distress, and any unpaid contractual benefits;

e    Reasonable attorney's fees, costs and two times the covered benefit (in addition to the covered benefit, which is at least $250,000.00), pursuant to Colorado law, including C.R.S. § 10-3-1116(1);

f.    Interest for wrongful withholding pursuant to C.R.S. 5-12-102;

g.    Pre-judgment and post-judgment interest, costs, expert witness fees, and any other relief to which Plaintiff is entitled;

h.    For such other and further relief as the Court deems just and proper.

i.    Damages for breach of contract, including any unpaid benefits and a lump sum award of future benefits or damages based on the value of benefits that would be received throughout Plaintiff's life pursuant to the policy and pursuant to Defendants repeated repudiation and inequitable, reprehensible and unequivocal conduct pursuant to the rule of law stated in Royal Macabees Life Ins. Co. v. Choren, 393 F.3d 1175 (10th circuit 2005) and DeChant v. Monarch Life Insurance Co. 554 N.W.2d 225 (Wisc. 1996).

Plaintiff reserves the right to move to add exemplary damages pursuant to C.R.S. § 13-21-102 because Defendants' conduct has been willful and wanton.

Dated this 31st day of October, 2019.

                    TAUSSIG & SMITH, P.C.
                    *Original signature on file.*

                         *John G. Taussig, III*
                    */s/*
                    John G. Taussig, III, #13496
                    Scott D. Smith #
                    5377 Manhattan Circle, Suite 203
                    Boulder, CO 80303
                    **ATTORNEYS FOR PLAINTIFF**

Address of Plaintiff:

81 Topaz Street
Golden, CO  80401